IN THE SUPERIOR COURT
OF THE VIRGIN ISLANDS

**FILED**

September 30, 2022 02:14 PM
ST-2011-CV-00419
**TAMARA CHARLES**
**CLERK OF THE COURT**



# IN THE SUPERIOR COURT OF THE VIRGIN ISLANDS
## DIVISION OF ST. THOMAS AND ST. JOHN

|  |  |
|---|---|
| SHORN T. JOSEPH,<br><br>       Plaintiff,<br>    v.<br><br>LEGISLATURE OF THE VIRGIN ISLANDS and the HONORABLE DONNA FRETT-GREGORY, in her official capacity as President of the 34th Legislature of the Virgin Islands,<br><br>       Defendants. | CASE NO. ST-11-CV-419<br><br>ACTION FOR DAMAGES<br><br><br>**JURY TRIAL DEMANDED**<br><br>Cite as 2022 V.I. Super 83U |

**Shari N. D'Adrade, Esq.**
**Christopher Kroblin, Esq.**
Kellerhals Ferguson Kroblin PLLC
9053 Estate Thomas, Suite #101
St. Thomas, VI 00802
*Attorneys for Plaintiff*

**Kye Walker, Esq.**
The Walker Legal Group
2201 Church Street, Ste. 16AB
Christiansted
St. Croix, VI 00820
*Attorneys for Defendants*

**CARTY, RENÉE GUMBS, JUDGE**

## MEMORANDUM OPINION

¶1 **THIS MATTER** is before the Court upon Defendants Legislature of the Virgin Islands and the Honorable Donna Frett-Gregory's[1] ("Defendant Legislature") *Daubert* Motion *in Limine* to exclude the expert testimony of Dr. Gary Albrecht, an economist, pursuant to Virgin Islands

---

[1] At the commencement of this action, Plaintiff Shorn Joseph originally named the Legislature of the Virgin Islands and Ronald E. Russell, as President of the 29th Legislature, subsequently Shawn Michael Malone as President of the 30th Legislature, Neville A. James as President of the 31st Legislature, Myron D. Jackson as President of the 32nd Legislature, and Novelle E. Francis as President of the 33rd Legislature. Neither Ronald E. Russell, Shawn-Michael Malone, nor Neville A. James is still in office and the Honorable Novelle E. Francis no longer serves as the President. Therefore, in accordance with V.I.R. Civ. P. 25(d), this Court has automatically inserted the name of the Honorable Donna Frett-Gregory as the current successor of the presidency of the Virgin Islands Legislature.

Rule of Evidence 702. Defendants' motion was filed on June 7, 2022, *nunc pro tunc* to May 25, 2022. Plaintiff Shorn Joseph ("Plaintiff" or "Joseph") filed his opposition on June 27, 2022. The Court held a *Daubert* hearing (the "Hearing') on July 13, 2022. For the reasons set forth herein, the motion to exclude the testimony and expert report of Dr. Albrecht will be denied.

## I. Factual Background

¶2 Shorn Joseph was employed by the Virgin Islands Legislature as Assistant Legal Counsel in the Office of Legal Counsel from July 2007 until February 9, 2011. While working at the Legislature, Joseph also served as First Lieutenant and Judge Advocate General in the United States Army Reserve ("Army Reserve") and a member of the National Guard of the Virgin Islands. On September 29, 2010, Joseph provided his supervisors, then-Senate President Louis Patrick Hill and Attorney Yvonne Tharpes, with written notice that he was being ordered to active military service for training. Joseph was ordered to attend training from October 23, 2010, to February 3, 2011; however, on January 19, 2011, he was informed by the Army Reserve that he was ordered to continue training until March 22, 2011. He notified the Defendants of this extension on January 31, 2011. He received no response. On February 7, 2011, Joseph contacted the office of then-Senate President Ronald E. Russell and was informed, by an office assistant, that he was being terminated, effective two days later on Wednesday, February 9, 2011.

## II. Procedural History

¶3 On September 14, 2011, Joseph filed a six-count Amended Complaint seeking relief in the form of reinstatement, back pay, and liquidated damages. He filed suit under the Uniformed Services Employment and Reemployment Rights Act of 1994 ("USERRA"), codified at 38 U.S.C. § 4311, et. seq., Title 23, Section 1531(a) of the Virgin Islands Code for employment discrimination, breach of his employment contract, and other causes of action. To support his

claims, Joseph retained an economic expert, Dr. Gary Albrecht. The Legislature did not contest Dr. Albrecht's expert qualifications, but they contested the methodology and reliability of the expert's report on the contention that he relied on insufficient reliable data and unverified data deriving solely from the Plaintiff. Defendants also contested the applicability of his report and testimony to the facts of this case.

¶4     In the Legislature's motion to exclude Dr. Albrecht's opinions, they argued that Dr. Albrecht's opinions cannot be presented to the jury since they rely on an insufficient factual record and on statements by Plaintiff without any proper factual foundation. Specifically, Defendants challenge Dr. Albrecht's opinions as to: (1.) the Plaintiff's economic loss in back pay, and (2.) the Plaintiff's future loss of earning capacity.

¶5     Dr. Gary Albrecht is an economist with over two decades of experience and specializes in economic forecasting and applied econometrics. He has written numerous peer-reviewed publications in legal and forensic economics journals and worked as an economics professor at Wake Forest University for over a decade. Dr. Albrecht has also served as Vice President and a member of the Board of Directors of the National Association of Forensic Economists and has testified as an expert in employment termination cases before.

¶6     They argued Dr. Albrecht's methodology and opinions are wholly unreliable as he failed to include a substantial amount of data regarding Plaintiff's new business ventures and income since the termination. All of Dr. Albrecht's economic projections were conducted without income deriving from Ideal Development, LLC; and not on foundational documentary evidence, but instead on a non-objective and unreliable single source – Attorney Joseph.

### III.    Legal Standard

¶7     Virgin Islands Rule of Evidence (V.I.R.E.) 702 governs the admissibility of expert

testimony in Virgin Islands courts.  Rule 702 provides:

> A witness who is qualified as an expert by knowledge, skill, experience,
> training, or education may testify in the form of an opinion or otherwise if:
>   (a) the expert's scientific, technical, or other specialized knowledge
>       will help the trier of fact to understand the evidence or to
>       determine a fact in issue;
>   (b) the testimony is based on sufficient facts or data;
>   (c) the testimony is the product of reliable principles and methods;
>       and
>   (d) the expert has reliably applied the principles and methods to the
>       facts of the case.

V.I.R.E. 702.

¶8     The Virgin Islands has relied on the analytical framework established in the United States

Supreme Court's decision in *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 US 579 (1993),

for determining whether expert testimony is admissible under Rule 702.  *Daubert* has developed a

trichotomous test.  *See Antilles v. Lembach*, 2016 W.L. 948969 (Mar. 14, 2016).    Three

requirements must be met: 1.) the expert must be qualified, 2.) the expert's opinion must derive

from a reliable process or technique, and 3.) the testimony must assist the trier of fact, i.e., it must

be applicable to the facts of the case.  Succinctly put, all three (3) factors: qualification, reliability,

and fit must be present. *Id.*

¶9     "Qualification" refers to the requirement that the witness possess specialized expertise.

Expert testimony must be rooted in the expert's scientific, technical, or other specialized

knowledge that will help the trier of fact understand the evidence or to determine a fact in issue.

The qualification requirement has been applied liberally by trial courts, as most allow a "broad

range" of knowledge, training, and skills to qualify as an expert.  Again, Defendants did not contest

Dr. Albrecht's qualifications and conceded that he is knowledgeable and qualified in economics.

4

¶10 The second factor, reliability, is the principal factor in this *Daubert* challenge. In determining whether expert testimony is reliable, the Court may consider several non-exhaustive factors including: (1.) whether the theory or technique can be tested; (2.) whether the methodology is subject to peer review and publication; (3.) whether, and how frequent, the methodology leads to erroneous results; (4.) the known or potential rate of error; (5.) whether the theory or technique has been generally accepted in the relevant scientific field; (6.) whether, and how strong, a relationship the technique has to methods which have been established as reliable; (7.) whether the expert witness is qualified to testify based on the methodology; and (8.) whether, and how often, the method has been put to non-judicial use. *See Gov't of the V.I. v. Jackson*, 47 V.I. 123, 126 (V.I. Super. Ct. 2005). The testimony must be based on the methods and procedures of science rather than on subjective belief or unsupported speculation. *Samuel v. United Corp.*, 64 V.I. 512, 526 (2016). The reliability inquiry must remain flexible, however, "not every *Daubert* factor will be applicable in every situation; and a court has discretion to consider other factors it deems relevant. *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 147-59 (1999). It is within the court's discretion to choose among reasonable means of excluding expertise that is fausse and science that is junky. *Id.* at 158-159 (Scalia, J. concurring). However, the court cannot "usurp[] the role of the jury by substituting its own determination of weight and credibility for that of the jury..." *Brathwaite v. Xavier*, 71 V.I. 1089, 1099 (V.I. 2019). Here, Defendants are asking this Court to run afoul of *Brathwaite*.

¶11 Fit, the third factor, requires the expert's testimony must be relevant for the purposes of the case and must assist the "trier of fact." *In re TMI Litig.*, 193 F.3d 613, 670 (3d Cir. 1999). Admissibility depends on the connection between the expert's opinion and the disputed factual issues of the case. *Id.* at 665. Fit is not always obvious, and scientific validity for one purpose is

5

not necessarily validity for other unrelated purposes. *Id.* at 621. The party attempting to introduce the expert's testimony bears the burden of demonstrating the reliability of the expert's technique by "more than a *prima facie* showing." *In re Paoli R. R. Yard PCB Litig.*, 35 F. 3d 717, 743 (3d Cir. 1994). Testimony which fails to "relate to any issue in the case is not relevant and … non-helpful." *Arvidson v. Buchar*, 72 V.I. 50, 82 (V.I. Super. Ct. 2019).

¶12     Conversely, when a trial court's inquiry into whether an expert's methodology is sufficiently tied to the facts of a case, concerns relating to the persuasiveness of the evidentiary "sources of an expert's opinion affect the weight to be assigned that opinion rather than its admissibility and should be left for the [trier of fact's] consideration." *Id.* Here, Defendants also challenged the expert's fit.

## IV.     Legal Discussion

### i.     Whether Dr. Gary Albrecht Should be Permitted to Testify

¶13     The crux of the Legislature's challenge has to do with the notable lack of additional income Plaintiff received from businesses that Plaintiff started after his termination and also from other sources, including contracts to provide legal services to senators. According to Defendants, the data used to apply the methodology to determine Joseph's economic loss, both front and back pay, is unreliable. Defendants moved to exclude Dr. Albrecht's testimony on the ground that Plaintiff's attempts to mitigate his damages were not considered in the report. They argue: (1.) Dr. Albrecht relied heavily on self-serving unsworn statements from Joseph, which were contradicted by Joseph's deposition testimony, (2.) Dr. Albrecht failed to consider Joseph's deposition testimony, (3.) he failed to consider the Economic Stability Act of 2011, which reduced salaries by 8% for employees of the Legislature from 2011-2013, (4.) he failed to include additional income from the military received during termination apart from Joseph's regular part-time military income, (5.) he

failed to include income from Ideal Development, LLC and LTS Enterprises, LLC (6.) Dr. Albrecht incorrectly based his conclusions on assumptions regarding purported pay increases, and (7.) he incorrectly used the median salary of a government employee rather than that of an attorney. To support their contentions, Defendants provided a plethora of documents detailing the different factors Dr. Albrecht did not include in his expert report, including the deposition transcript of Joseph and different judicial filings regarding business ventures Joseph owns.

¶14     Joseph is self-employed and formed two limited liability companies, Ideal Development, LLC and LTS Enterprises, LLC after his termination from the Legislature. He formed Ideal Development, LLC in January 2013 and LTS Enterprises, LLC in September 2015. Dr. Albrecht testified he was aware of a business venture of Joseph's but was not familiar with the name of the company. Testimony of Dr. Albrecht (7/013/2022 *Daubert* Hearing via Zoom). He further stated he did not have the financial information from one of the companies but was aware of a significant financial loss of $51,161 from a company Plaintiff started, nevertheless, Joseph's income from the company was not considered when developing his report.

¶15     Additionally, the Legislature posits that much of the data that was used to calculate the back and front wages is unreliable because it is based on Plaintiff's opinion and includes incorrect information, including the wrong salary information in the calculations. Dr. Albrecht admitted he was unaware of the effects the Economic Stability Act would have on Joseph's wages for the years 2011-2013 had Joseph continued employment with the Legislature during this period. He testified he recently became aware of the pay back to the government employees, and considering Plaintiff was terminated in the first quarter of 2011, Dr. Albrecht did not consider the Economic Stability Act as part of Plaintiff's duty to mitigate his damages. Further, Dr. Albrecht was unaware as to whether and how much Plaintiff would have been paid by the V.I. Government had he continued

employment. The issue is whether the economist's opinion would have changed, and to what extent, if he had the opportunity to review and analyze the missing financial records and considered applicability of the Economic Stability Act. The following analysis of Dr. Albrecht's methodology shows that the testimony should be permitted.

## ii.    Methodology Used

¶16    To show his method, Dr. Albrecht provided eight (8) Tables analyzing different scenarios of Joseph's employment, which take into consideration inflation and retirement benefits with regard to the present and future values of Joseph's wages. He used objective data from the work expectancy charts generated by the Virgin Islands Department of Labor to determine Joseph's likelihood of obtaining employment in the legal field post-termination from the Legislature, including the 2018 Virgin Islands Occupational Employment and Wage Rates ("OES") for Multiple Occupations chart. He also projected Joseph's retirement from the Virgin Islands Government would be at 61 years old, which is the time at which Joseph would have worked for 30 years with the Legislature. He further factored in objective data from the Government Employees Retirement System. Dr. Albrecht also testified he used April 1, 2020, as a subjective marker representing the date of his report. This date chosen by Dr. Albrecht does not alter the overall methodology he used but does impact the calculations. Irrespective of this subjective date, the methodology of his calculations is reliable.

¶17    When determining the amount Joseph would have received in wages, Dr. Albrecht first calculated Plaintiff's salary as if he had continued employment with the Legislature between February 11, 2011, to April 1, 2020 (backpay). For his calculations, he used Joseph's 2010 W-2 form to determine his wages were $86,000. Using the Consumer Price Index, he then factored in what Joseph's wages would have been if he had continued employment with the Legislature and

concluded the wages in 2020 to be about $97,722. Table 1 of the report provides what Joseph would have received in wages if he remained employed at the Legislature until April 1, 2020, and also considers what Joseph would have received in retirement benefits and health insurance benefits during that period. Table 2 uses the same wages reported in Table 1, but only shows the present value of earnings[2] to April 1, 2020, without factoring in the other benefits. Therefore, as reflected in Table 2, Joseph would have earned approximately $807,948 during that nine-year period between 2011 and 2020. Dr. Albrecht also factored in an interest rate for inflation depending on the Consumer Price Index ("CPI") for the given year. Dr. Albrecht then deducted Plaintiff's actual earnings of $131,912 and subtracted it from $807,948, which resulted in a total of $676,036. However, Dr. Albrecht admitted during the hearing that he did not include $71,610.40, which represents Plaintiff's 2018 income, and $45,932.14 which represents Plaintiff's 2019 income. Joseph provided no income information for 2020. Had Dr. Albrecht factored in Joseph's unreported earnings, totaling $117,542.54, the calculated backpay would be $558,493.46. Despite the calculations being inaccurate, Dr. Albrecht's methodology of using tables for economic forecasting and the CPI is sound and reliable.

¶18     Then, Dr. Albrecht calculated the present value of earnings between April 1, 2020, and December 31, 2055, the approximate date of Plaintiff's death. This represents front pay. In Table 1, Dr. Albrecht determined the total earnings Joseph would have expected to earn if he had continued employment with the Legislature until retirement. He used $97,722 as the wage for years 2021 through 2038, Joseph's retirement year. For years 2039 through 2055, Dr. Albrecht subtracted $10,749 from the $97,222 to account for what Joseph would not be paying in retirement

---

[2] The present value of earnings is: "the value today of an amount of money that you expect to receive in the future, considering the fact that a future payment is worth less than one received now." *See* The Cambridge Business English Dictionary, https://dictionary.cambridge.org/dictionary/english/present-value.

benefits. Then, he added $6,138 each year for health insurance benefits. Thus, Joseph's front pay had he continued employment would have been $2,951,018. This amount is the front pay loss if Joseph was unable to obtain employment and includes a 3% interest rate for inflation. Dr. Albrecht explained that the end result would be the same whether inflation was included or not.

¶19     He further explained that to accurately determine Joseph's front pay wages he considered what Joseph would have received in wages had he obtained other employment in the Virgin Islands not working as an attorney. To determine this, he relied on the OES chart provided by the Virgin Islands Department of Labor to determine the median salary of those employed in the Virgin Islands was $42,870. In Table 5 of Dr. Albrecht's report, he applied the $42,870 average salary to calculate the present value of earnings if Joseph did not continue employment with the government from April 1, 2020, to December 31, 2055, for a total of $929,253. He then subtracted that amount from what he would have earned if he continued employment with the government calculated in Table 3 ($2,951,018) for a total of $2,021,765. Again, as Dr. Albrecht testified, the methodology used here is ubiquitous in the economics industry.

¶20     Dr. Albrecht finally added the two totals, the backpay ($676,036) and front pay ($2,021,765), together to find the present value of the total difference in earnings from February 11, 2011, to December 31, 2055, to be $2,697,801. Had he considered the unreported income, the difference in earnings would be $2,580,258.46; however, this does not render the methodology unsound.

¶21     Yet, despite the mathematical calculations being straightforward, Defendants argue Dr. Albrecht's report is unreliable. At the hearing, Defendants produced Plaintiff's income tax information from 2008 to 2019, including income from LTS Enterprises, LLC. Dr. Albrecht testified some of the years during that period included tax returns and not the corresponding W-

2's and some years only included income from the military. Further, Defendants argue under a USERRA claim, Plaintiff was required to mitigate his losses, which he clearly attempted to do by engaging in his different business ventures. However, Defendants posit Plaintiff's failure to disclose his earnings from these businesses renders Dr. Albrecht's report unreliable. Defendants are correct that the lack of all the data would create a different monetary outcome. Evidently, the calculations would have changed thus the outcome would be different. However, the methodology used is widely accepted in the principles of economics and Defendants offered no evidence to controvert the methodology. The reliability of the underlying data is not a matter for which the Court should exclude the testimony of Dr. Albrecht.

¶22    The Legislature also asserted Dr. Albrecht's opinion is not based on foundational documentary evidence, but based primarily on Attorney Joseph, therefore, the testimony derives from biased, uncorroborated evidence, and therefore does not fit and is unreliable. Further compounding this problem is Dr. Albrecht's heavy reliance on Attorney Joseph rendering the opinion unreliable due to the insufficiency of underlying data as the report did not take into consideration a multitude of documents showing additional sources of income from two businesses: Ideal Development, LLC and LTS Enterprises, LLC., which Plaintiff failed to disclose in his response to interrogatories, requests for production, and his deposition. Despite the lapse in data, it does not render Dr. Albrecht's methodology unreliable.

### iii.     Whether the Economic Report is a Proper Fit

¶23    As it relates to fit, the Court finds that the principles of economics are applicable to the facts of this case. "The expert's testimony must be relevant for the purposes of the cases and must assist the trier of fact." *In re TMI Litig.*, 193 F.3d 613, 670 (3d Cir. 1999). Admissibility depends on the connection between the expert's opinion and the disputed factual issues of the case. In

11

addition to the conversations he had with Plaintiff, Dr. Albrecht reviewed a considerable amount of exogenous materials as previously stated.[3] Dr. Albrecht testified that he analyzed the losses under two scenarios: 1) determined back pay from February 9, 2011, the date of termination, to April 1, 2020, a subjective marker representing the date of his expert report, and 2) determined front pay from April 1, 2020, to December 31, 2055, the approximate date of Plaintiff's death. The calculations by Dr. Albrecht are directly related to the facts of this case, and therefore the Court finds the testimony is a proper fit.

## V.    Legal Analysis

¶24    Defendants are correct when they state the Court is the gatekeeper. While the Court is cognizant of this responsibility, such responsibility is juxtaposed with the jury's absolute right to assess whatever weight to the evidence it deems appropriate. Though the Court recognizes the salient issue of insufficiency of data, it is not for the Court to determine the weight of the evidence. *Alexander v. People of the V.I.*, 60 V.I. 486, 498 (V.I. 2014). "[W]e have generally held that inconsistencies or discrepancies in witness testimony generally go to the weight, rather than the admissibility of the testimony." *Brathwaite v. Xavier*, 71 V.I. 1089, 1098 (V.I. 2019). The law irrefutably declares that the jury, and not the court, determines the credibility of witnesses in a jury trial. *Alexander*, at 498. "[I]t is the jury's special province to weigh conflicting testimony, determine credibility and draw inferences." *United States v. Montoya*, 827 F.2d 143, 155 (7th Cir. 1987). That function is exclusively within the province of the jury. It is this Court's responsibility to determine the admissibility of the evidence.

¶25    As it stands, the Court does not believe the economic expert report or testimony is

---

[3] *See* Defendants' Exhibit 20: Dr. Albrecht's expert report, March 5, 2020.

inadmissible because portions of the financial records, albeit maybe a significant portion, were omitted from Dr. Albrecht's consideration. Information regarding Plaintiff's self-generated income through his various business holdings and agreements were not included in the report. This lack of evidence should be left for trial examination, and squarely within the jury's determination to decide the sufficiency of facts. Neither does the Court believe that the expert testimony should be excluded because Dr. Albrecht relied heavily upon information provided by Plaintiff. Afterall, Joseph was not the only source of information. Dr. Albrecht relied upon exogenous materials including the Consumer Price Index, data from the Virgin Islands Department of Labor, interest rates as provided from the Federal Reserve, life expectancy charts, Occupational Employment and Wage Rates charts, and information regarding retirement benefits for government employees in the Virgin Islands. He also used Joseph's questionnaire, information gathered from conversations with the Plaintiff, Joseph's tax information from 2008 to 2019, and his earning statements of 2013 and 2014 when he made his determinations.

¶26    Additionally, he testified about the principles of economics that economists generally use in forecasting and the corresponding data shows Dr. Albrecht's methodology was not only reliable, but also applicable. After compiling data, a forecast is provided upon making a comparative analysis of pre-termination and post-termination, i.e., what Joseph would have earned, had he not been terminated. Therefore, the Court believes Dr. Albrecht's expert testimony and opinions are admissible.

## VI.    Conclusion

¶27    The Court finds that Dr. Albrecht is well qualified, very knowledgeable, and can render his opinion based on his expertise. The Court sees no prejudice being brought against the Legislature.

Accordingly, the motion *in limine* to exclude Dr. Gary Albrecht will be denied and an Order

memorializing the same follows.

Dated: September 30 , 2022
      *nunc pro tunc* to 7/13/2022

**Renée Gumbs Carty**
Judge of the Superior Court
of the Virgin Islands

**ATTEST:**
Tamara Charles
Clerk of the Court

By:

for Donna D. Donovan
Court Clerk Supervisor 9 / 30 / 2022

14

## IN THE SUPERIOR COURT OF THE VIRGIN ISLANDS
## DIVISION OF ST. THOMAS & ST. JOHN
******

SHORN T. JOSEPH,                                    )
                                                    )
                    Plaintiff,                      )        CASE NO. ST-11-CV-419
          v.                                        )
                                                    )
LEGISLATURE OF THE VIRGIN ISLANDS and  )        ACTION FOR DAMAGES
the HONORABLE DONNA FRETT-GREGORY,     )
in her official capacity as President of the 34th  )        **JURY TRIAL DEMANDED**
Legislature of the Virgin Islands,                 )
                                                    )
                    Defendants.                     )        Cite as 2022 V.I. Super 83U
                                                    )

## ORDER

The Court having issued a Memorandum Opinion on this date, it is hereby

**ORDERED** that Defendants Legislature of the Virgin Islands and the Honorable Donna

Frett-Gregory's *Daubert* motion in *limine* is **DENIED**; and it is further

**ORDERED** that a copy of this Order and the accompanying Opinion shall be directed to

Shari N. D'Andrade, Esquire, Christopher Kroblin, Esquire, and Kye Walker, Esquire.

Dated: September 30 , 2022
     *nunc pro tunc* to 7/13/2022

**Renée Gumbs Carty**
Judge of the Superior Court
of the Virgin Islands

**ATTEST:**
Tamara Charles
Clerk of the Court

By:
     Donna D. Donovan
     Court Clerk Supervisor  9 / 30 / 2022